UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| TERRANCE SWANN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:22-cv-00488-JRS-DML |
| ) | |
| SAMUEL J. BYRD, et al., ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Terrance Swann is a prisoner currently incarcerated at New Castle Correctional Facility, but the events that gave rise to his complaint occurred at Wabash Valley Correctional Facility ("Wabash Valley"). Mr. Swann suffered from a number of medical maladies, including lower back pain, a knot in his testicles, an injured jaw, numbness and pain in his limbs, and a urinary tract infection. Mr. Swann brought this lawsuit against Dr. Samuel Byrd, Centurion Healthcare, Dr. Naveen Rajoli, Nurse Practitioner Victoria Crawford, LPN Barbara Riggs, Nurse Theresa Auler, Nurse Lauren Cupp, Nurse Tracy Chickadaunce, Nurse Lesa Wolfe, Nurse Mikayla Willis, Nurse Heather Lowell-Pangallo, Nurse Tianna Murray, Nurse Ivalee Shorter, B. Foster, Dr. Jason Carter, Nurse Holly Denman, and Nurse Debra Lee alleging that they failed to provide him adequate healthcare, including a bottom bunk pass at Wabash Valley.

Upon screening of Mr. Swann's third amended complaint, the Court allowed Mr. Swann to proceed with *Monell* claims against Centurion, and Eighth Amendment deliberate indifference and state law negligence claims against all individual defendants. Dkt. 54 at 4. The Court later dismissed claims against Jason Carter, Holly Denman, and Nurse Debra Lee as duplicative to

1

claims in other lawsuits Mr. Swann had filed. Dkt. 88. Defendants Tianna Murray and B. Foster were later dismissed without prejudice for lack of service. Dkt. 178.

The remaining Defendants move for summary judgment contending that they were not deliberately indifferent to Mr. Swann's medical needs, that Centurion did not maintain any unconstitutional policy or practice related to Mr. Swann's healthcare needs, and that his state law medical malpractice claims cannot prevail because he has not retained a medical expert. For the reasons that follow, Defendants' motion for summary judgment, dkt. [171], is **granted** and final judgment shall be entered.

## I.
## Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Swann and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

At all relevant times, Mr. Swann was an inmate at Wabash Valley. Dkt. 173 at 1.

Dr. Byrd, Centurion, Dr. Rajoli, Nurse Practitioner Crawford, Nurse Riggs, Nurse Auler, Nurse Cupp, Nurse Chickadaunce, Nurse Wolfe, Nurse Willis, Nurse Lowell-Pangallo, and Nurse Shorter were all employees of Centurion, the healthcare provider at Wabash Valley. *Id.* at 1.

### B. Mr. Swann's Medical Care

Prior to the events in this lawsuit, Mr. Swann had presented with moderate hypertension and moderate gastroesophageal reflux disease and was enrolled in the Wabash Valley Chronic Care Clinic, which provided him with ongoing medical treatment at regular intervals. Dkt. 172-1 at 4.

On April 9, 2021, Mr. Swann first reported lower back pain to Dr. Byrd during a Chronic Care Clinic visit. Dkt. 172-2 at 1- 3. Dr. Byrd charted that Mr. Swann "reports low back pain is secondary to simply inactivity in segregated environment…[h]e would simply like a [home

3

exercise program] if I could provide one for him." *Id.* at 1. Mr. Swann alleges that he also requested some form of pain medication during this visit. Dkt. 186 at 5.

On May 27, 2021, Dr. Byrd conducted a follow-up provider visit with Mr. Swann to review his updated lab work. Dkt. 172-2 at 4-6. 7. Mr. Swann refused his annual health screen but completed the echocardiogram the doctor ordered, which showed no concerns. Dkt. 172-3 at 3. Dkt. 172-2 at 8. On August 20, 2021, Mr. Swann saw Nurse Auler for a visit related to a previously submitted health care request form in which he had complained of back pain. Dkt. 172-2 at 10. During the visit, Mr. Swann reported back pain dating to an injury in 1998 and a reinjury in August 2020. *Id.* at 13. He also stated that he purchased a back brace from another offender. *Id.* Nurse Auler noted that she discussed the issue with Dr. Byrd, who recommended back exercises. *Id.*

Dr. Byrd alleges that Mr. Swann had a history of reporting to different medical staff and a diagnosis of antisocial personality disorder, which made it difficult for Dr. Byrd to accept his reports of pain at face value and made Dr. Byrd wary of being too aggressive in his treatment. Dkt. 172-1 at 5. Dr. Byrd alleges that if Mr. Swann had acutely injured his back in August 2020, Dr. Byrd would have expected him to mention it during his April 2021 appointment when he began complaining of back pain. *Id.* Mr. Swann alleges that he specifically mentioned this injury during this visit in his affidavit, however, the medical record from the clinic visit did not denote any such injury. Dkt. 186- at 6, Dkt. 172-2 at 1.

On May 31, 2021, Mr. Swann submitted a healthcare request form stating "I am 250, 42, they have me on the top bunk – last week I stang my ankle getting down in the morning; the top bunk is causing my back to (lower) severely ache. I cannot sit up fully cause my head will hit the ceiling." Dkt. 172-2 at 15.

When Nurse Auler saw him for this request on September 2, she charted:

> Offender would not sit on the exam table for this nursing encounter. He stayed in the doorway explaining above. Educated offender that based on the current BBP eligibility he does not meet criteria for bottom bunk. Offender was not pleased with this response and said the custody staff and case managers advised him that medical had to be the one to give him a bottom bunk pass to be moved. He is also requesting that if we don't give him a bottom bunk pass that we(medical) put in a request for him to go back to the SHU so that he doesn't have to be on top bunk. Educated the offender that medical does not make the bed assignments and that he does not have a clinical condition that would warrant him a single cell in the SHU or need for bottom bunk, et back pain does not meet the criteria. The offender then walked out of the room and said he was just going to file a lawsuit for undo pain and suffering.

Dkt. 172-2 at 17.

Because Mr. Swann would not agree to sit on the exam table, Nurse Auler could not perform an assessment of his condition, which would have allowed her to refer him to a physician. *Id.* Mr. Swann does not contest that he did not agree to sit on the exam table but does testify that Nurse Auler "never tried to assess me and she had a very bad attitude." Dkt. 186 at 6.

Dr. Byrd concurred in his affidavit that Mr. Swann did not present with an objective medical need for a bottom bunk pass during this appointment. Dkt. 172-1 at 6. Further he testified that even if he had, medical staff cannot guarantee a patient's placement on a bottom bunk because bed assignments are within the exclusive control of IDOC and depend upon considerations of availability and institutional safety. *Id.*

On September 21, Dr. Rajoli met with Mr. Swann for a scheduled chronic care clinic visit and discussed his reports of low back pain. Dkt. 172-2 at 19-22. Mr. Swann reported that he was able to walk up and down stairs, squat, kneel, perform all activities of daily living, and walk an unlimited distance. *Id.* 23. Dr. Rajoli prescribed Mr. Swann Tylenol 500mg twice daily as an additional measure to the home exercise plan and weight management previously prescribed. *Id.* at 21.

5

The parties contest whether Mr. Swann refused a chronic care clinic visit on March 8, 2022. Dkt. 172-3 at 4, Dkt. 186 at 7. However, Mr. Swann did subsequently submit a health care request form with complaints of blood in his urine, and he was seen shortly thereafter by Nurse Auler, who contacted Dr. Byrd during her assessment of Mr. Swann. Dkt. 172-4 at 4-5. Dr. Byrd ordered a urinalysis and culture to be performed and a follow-up appointment to be scheduled. Dkt. 172-1 at 8. Although Mr. Swann did have blood in his urine, Dr. Byrd testified that samples collected and tested on March 16 and March 31 returned normal with no concerns. Dkt. 172-1 at 7, Dkt. 172-4 at 8-9.

On March 17, 2022, Mr. Swann felt a pop in his lower back that caused him to fall on the floor. Dkt. 172-4 at 11. Mr. Swann was then taken via wheelchair to the prison medical hospital where he was seen by Nurse Chickadaunce. Dkt. 186 at 7-8. The nurse charted that "BLE strength was strong with push/pull of feed. Only complaints are in lower back. Unable to sit up straight or lie flat on back. Dr. Byrd notified and received order for Toradol 60 mg injection x1 and an x-ray of lumbar spine." Dkt. 172-4 at 11. Results from the x-ray showed no acute fractures, dislocations, bony abnormalities, degenerative changes, and that the lumbar were in anatomical alignment with normal disc space and height. Dkt. 172-4 at 16.

On April 6, 2022, Mr. Swann was scheduled to see Dr. Byrd for a provider visit. Dkt. 172-4 at 17-18. Defendant Shorter filled out a medical refusal form indicating that Mr. Swann had appeared in the Offender Services Building but left before being seen, which was signed by another correctional officer. Dkt. 172-3 at 5. Mr. Swann alleges on that day that he was present at the office and called into the area where provider visits were to take place, but the medical computers went down and doctors and nurses were unable to log in. Dkt. 186 at 8. He was then told he would be rescheduled or called back out when the computers were running. *Id.*

In May of 2022, Mr. Swann reported that his lower back pain had returned following the Toradol injection he received in March. Dkt. 172-4 at 19. Nurse Wolfe met with Mr. Swann and educated him on back exercises and stretches and alternating use of ibuprofen and Tylenol for inflammation and pain relief. *Id.* at 20. On May 23, 2022, Mr. Swann attended a chronic care clinic visit with NP Crawford. Id. at 22-25. He reported lower back pain "for several months" that had moved to the center of his back. *Id*. at 24. NP Crawford referred Mr. Swann for an onsite provider visit for further examination and ordered comprehensive lab work after noting the presence of blood in his urine. *Id*. She did not order any follow-up upon receipt of the lab work, and there is no indication that Mr. Swann developed a urinary tract infection. Dkt. 172-1 at 9.

On June 6, Dr. Byrd updated Mr. Swann's medication orders. Dkt. 172-4 at 28-29. After submitting a health care request form with complaints of back pain Mr. Swann received a nurse visit on July 7, 2022. Dkt. 172-4 at 31-33. On July 27, Dr. Byrd met with Mr. Swann for a provider visit to again discuss his back pain. Dkt. 172-1 at 10.

Mr. Swann reported to the doctor lower back pain secondary to degenerative change, but Dr. Byrd noted that Mr. Swann's lumbar spine x-ray results showed no injury or degenerative change. Dkt. 172-4 at 34. Mr. Swann further told Dr. Byrd that Tylenol, prednisone, and Toradol had all been ineffective and that he could not complete home exercises because he could not tolerate the associated pain. *Id.* Dr. Byrd decided to elevate Mr. Swann's treatment by starting him on the medications Mobic and Keppra, and he told Mr. Swann that he would consider prescribing physical therapy as a next step if needed including the use of a "teeter hang up device" once Mr. Swann was released to general population. Dkt. 172-1 at 10, Dkt. 186 at 9.

During this same visit, Mr. Swann reported to Dr. Byrd a cyst on his testicle that Mr. Swann claimed had started out the size of a pea in 2010 but had steadily grown in size. Dkt. 172-4 at 34.

7

Dr. Byrd noted in his chart that at the time of the visit, Mr. Swann reported the cyst as being the size of a quarter, while Mr. Swann testified in his affidavit that he told the doctor during the visit that the cyst was roughly the size of a nickel or walnut. Dkt. 172-4 at 34, Dkt. 186 at 9. Mr. Swann further testified that Dr. Byrd told him "If it is causing you pain, I will get you out to have it removed." Dkt. 186 at 9.

Dr. Byrd reviewed the 2010 ultrasound results that first showed the existence of the cyst in Mr. Swann's testicle and determined that the cyst measured 1.5 cm in diameter in 2010, about the same as a quarter. Dkt. 172-1 at 11. The doctor determined that there had been no change to the size of the cyst, and it appeared stable. *Id.* Dr. Byrd testified that because Mr. Swann did not report any urgent or emergent symptoms, he decided that further imaging and surgical consultation would not be necessary unless and until the cyst began causing symptoms or demonstrating actual growth. *Id.*

On August 26 and October 17, Dr. Byrd renewed Mr. Swann's medications. Dkt. 172-4 at 38-41. In late October 2022, Mr. Swann submitted a health care request asking that Dr. Byrd allow him to have the back brace Mr. Swann bought from another inmate previously. Dkt. 172-4 at 42. On October 29, Nurse Willis responded by visiting Mr. Swann in his cell. *Id.* at 43. The nurse reported that Mr. Swann got out of bed with no difficulty and walked to the cell door with a normal gait. *Id.* at 52. Nurse Willis advised Mr. Swann that IDOC policies prohibited him from having his back brace while in the segregated unit but advised him of stretches he could perform to provide relief to his back. Dkt. 172-1 at 11. Dr. Byrd testified that he never prescribed a back brace for Mr. Swann because Mr. Swann never presented with any of the limited medical conditions for which a temporary back brace might be clinically indicated and medically necessary. *Id.* at 12.

Mr. Swann was scheduled to appear for a chronic care clinic visit on November 4, 2022, but Nurse Shorter documented that Mr. Swann refused the visit. Dkt. 172-4 at 44-45. In late November, Mr. Swann renewed his request for a back brace, and Nurse Lowell-Pangallo responded, noting that Mr. Swann got out of bed and walked to the sick call office without difficulty. Dkt. 172-4 at 46-48. Nurse Lowell-Pangallo told Mr. Swann that he had refused his chronic care clinic visit previously and would need to attend that appointment before any consideration could be given to ordering him a back brace. *Id.* Mr. Swann left the nurse visit before further assessment could occur. *Id.*

On December 20, 2022, Mr. Swann appeared for sick call and reported to Nurse Murray that he needed the warden's approval to allow him to have a back brace in his disciplinary segregation unit because he was in pain constantly and could not stand or sit up. *Id*. at 49-50. Nurse Murray noted that she had personally witnessed Mr. Swann up in his cell working out and cleaning floors while standing without complication and found no abnormalities to Mr. Swann's back. *Id.* Though Mr. Swann complained of a knot on his right testicle, he refused to allow Nurse Murray examine it due to her gender. *Id*. Nurse Murray completed a urinalysis with no red or white blood cells. *Id.* Dr. Byrd reviewed and signed off on her medical record entry on December 29. *Id.* at 51.

Mr. Swann transferred from Wabash Valley Correctional Facility on February 14, 2023. Dkt. 172-1 at 13. Mr. Swann received surgery to remove the cyst in his testicle on April 28, 2025. Dkt. 186 at 9.

### III.
### Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v.*

9

*Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Mr. Swann's back and testicular pain was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the Defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Swann's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Swann "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

10

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

### A. Defendants Dr. Rajoli, Nurse Crawford, Nurse Auler, Nurse Cupp, Nurse Wolfe, Nurse Willis, and Nurse Lowell-Pangallo

Defendants Dr. Rajoli, Nurse Crawford, Nurse Auler, Nurse Cupp, Nurse Wolfe, Nurse Willis, and Nurse Lowell-Pangallo are entitled to summary judgment on all claims. In his response to the Defendants' summary judgment motion, Mr. Swann concedes that these defendants were not deliberately indifferent and concedes all state law claims against them. Dkt. 186 at 33. Accordingly, summary judgment is **granted** as to these defendants.

### B. Defendants LPN Riggs and Nurse Chickadaunce

Mr. Swann contends that LPN Riggs and Nurse Chickadaunce were deliberately indifferent when LPN Riggs allowed Nurses Wolfe and Murray to triage Mr. Swann's medical conditions, including an injured jaw, blood in his urine, back pain, and knot in his testicle, in violation of IDOC policy, and when LPN Riggs and Nurse Chickadaunce deferred Mr. Swann's healthcare requests regarding back pain, blood in his urine, and the knot in his testicle, thereby prolonging his pain. Dkt. 54 at 3. LPN Riggs argues that IDOC healthcare service directives specifically allow LPNs to participate in triaging with other members of the healthcare team. Nurse Chickadaunce argues that her assessment, which led to prompt treatment from Dr. Byrd, does not evidence deliberate indifference. Thus, they argue, Mr. Swann cannot demonstrate that they were aware of a substantial risk of harm to Mr. Swann and deliberately disregarded that risk. *Id.*

The Court agrees that Mr. Swann cannot demonstrate that LPN Riggs and Nurse Chickadaunce were deliberately indifferent to his serious medical needs. Mr. Swann has presented

11

no evidence against LPN Riggs to contest that IDOC policy allows her to triage his care with other nurses or why her allowing nurses to triage his care is in itself deliberately indifferent. In fact, Mr. Swann does not address LPN Riggs's or Nurse Chickadaunce's alleged deliberate indifference in his response brief at all. Dkt. 185. His only contestation of the facts involving Nurse Chickadaunce are that he disputes her findings in the assessment she performed because he contends he was in more severe pain. Dkt. 195 at 15-16. However, he does not allege why his disagreement of her assessment was deliberately indifferent, and he does not contest that her assessment led to an immediate x-ray and injection of Toradol to ease his pain. Dkt. 172-4 at 11. Plaintiff is the nonmoving party, so he receives "the benefit of conflicting evidence and reasonable inferences." *Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). That said, he must "produce evidence sufficient to establish [the] element[s] essential to" his claim. *Id.* Mr. Swann has failed to do so here. Accordingly, summary judgment must be **granted** as to all claims against LPN Riggs and Nurse Chickadaunce.

### C. Nurse Ivalee Shorter

In his complaint, Mr. Swann alleges that Nurse Shorter failed to reschedule Mr. Swann's medical appointments when custody staff falsely reported that Mr. Swann had refused his visits, and that the nurse deferred Mr. Swann's healthcare requests regarding back pain, blood in his urine, and the knot in his testicle, thereby prolonging his pain. Dkt. 54 at 3. However, Mr. Swann has not presented evidence that any of Nurse Shorter's actions rise to the level of deliberate indifference. The undisputed evidence shows that out of the four appointment refusals that Mr. Swann attributes to Nurse Shorter, only two were actually signed by her, and the other two were signed by other custody staff. Dkt. 172-3 at 4, 7, Dkt. 172-4 at 44-45. The only refusals signed off by Nurse Shorter were dated April 6, 2022, and November 4, 2022. Dkt. 172-4 at 44-45, Dkt. 172-3 at 5. On April

6, 2022, Mr. Swann testified that "I was called to the back where the provider visits take place…the medical computers went down …a nurse told me to go back to my unit." Dkt. 186 at 8. Mr. Swann alleges that for the November 4 visit, Nurse Shorter "did not attempt to ascertain whether the Plaintiff refused [the chronic care clinic visit], she simply signed the Plaintiff's last name." Dkt. 185 at 29. But even if the Court assumes that Nurse Shorter did fail to determine whether Mr. Swann was actually refusing these visits or incorrectly reported them as refusals, this in itself does not evince deliberate indifference. For Nurse Shorter to be found deliberately indifferent, Mr. Swann must prove that she "knows of and disregards an excessive risk to inmate health or safety." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016), quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). He has not done so here.

For Mr. Swann's claims that Nurse Shorter was deliberately indifferent because she failed to reschedule his medical appointments, it is uncontested that it is not the responsibility of Wabash Valley medical staff to reschedule medical visits when a patient refusal is reported. Dkt. 172-1 at 59. Dr. Byrd testified that "[i]f a patient misses an appointment without explanation and is still in need of treatment, he is expected to submit a health care request form to be scheduled at the proper time…Otherwise, medical staff would end up rescheduling appointments for patients who no longer want or need them, and patients who do want and need treatment and have followed proper procedure by requesting care would be unfairly disadvantaged. *Id.* As Mr. Swann has failed to present a dispute of material fact as to whether Nurse Shorter was deliberately indifferent to his serious medical needs, summary judgment for her must be **granted.**

### D. Defendant Dr. Byrd

Mr. Swann brings two central Eighth Amendment claims against Dr. Byrd. He contends that Dr. Byrd was deliberately indifferent when 1) Dr. Byrd made the decision not to provide Mr.

13

Swann with a back brace, and 2) when he failed to provide Mr. Swann surgery for his testicular cyst. Dkt. 185 at 37-40. However, he has failed to present evidence that a reasonable juror would find there is a dispute of material fact, and accordingly, summary judgment must be **granted** as to all Eighth Amendment claims against Dr. Byrd.

### i. Failure to Provide a Back Brace

Medical professionals may be found to be deliberately indifferent if they persist in an ineffective course of treatment, render a treatment decision that departs from accepted professional judgment, or delay in providing treatment. *Petties*, 836 F.3d at 729. The Court examines the totality of Mr. Swann's medical care when evaluating whether Dr. Byrd was deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018). "The Eighth Amendment does not guarantee a patient his preferred medication or a pain-free recovery." *Weightman v. O'Brien*, No. 24-1543, 2025 WL 487214, at *3 (7th Cir. Feb. 13, 2025) (citing *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023)). Further, "an inmate is not entitled to demand specific care, and medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (internal quotation marks and citations omitted)).

The undisputed evidence reflects that Mr. Swann was seen on many occasions over the course of the relevant timeframe by Dr. Byrd, who provided frequent treatment, medications, and evaluations of Mr. Swann's chronic back condition. Although Mr. Swann contends that he should have received an MRI, Dr. Byrd used his medical judgment to evaluate Mr. Swann's condition, and Mr. Swann is not entitled to demand the specific course of treatment he would have preferred. Further, he has proffered no evidence that Dr. Byrd's treatment decisions were not consistent with accepted professional judgment.

The record reflects that Dr. Byrd saw no indication in Mr. Swann's medical records that any provider had ever prescribed him a back brace previously, and that Mr. Swann never presented with any condition where a back brace would have been clinically indicated. Dkt. 172-1 at 12. Unlike the case Mr. Swann cited where an inmate had a degenerative bone disease that required a back brace, a back brace was contraindicated for Mr. Swann's condition because it would lead to muscle atrophy, which would have worsened his underlying condition. *Id.* These decisions reflect a determined effort to treat Mr. Swann's chronic pain. No juror could conclude that Dr. Byrd's decisions were not the product of professional judgment.

    **ii.**    **Testicular Cyst**

As to Mr. Swann's complaint that Dr. Byrd violated his constitutional rights by failing to provide him surgery for his testicular cyst, the record reflects that Dr. Byrd used his professional judgment to determine that Mr. Swann's cyst did not present a substantial risk of serious harm. From his consultation with Mr. Swann in July of 2022 and review of the previous documentation from 2010, Dr. Byrd determined that the cyst was not growing and surgery was not necessary at that time. Further, Dr. Byrd had already ordered a urinalysis culture to monitor Mr. Swann's condition, and all his results had returned normal. Dkt. 172-4 at 8-9.

Further, Mr. Swann has not actually shown that his cyst was an objectively serious medical need. His own evidence cited in his response notes that "[a]n epididymal cyst is a harmless, fluid filled growth on a man's testicle. They are quite common and don't usually require treatment." Dkt 186 at 54. And although he eventually did get the cyst removed by another doctor in 2025, the urologist noted that the cyst bothered Mr. Swann only enough "to consider surgical repair," but never identified surgical intervention as urgent, necessary, or even recommended. *Id.* at 69-71. In

15

summary, the evidence reflects that Mr. Swann's medical treatment was the product of measured and persistent efforts to treat his chronic pain. Dr. Byrd is entitled to summary judgment.

### A. Centurion of Indiana

In order to maintain a § 1983 claim against Centurion, Mr. Swann must show that his constitutional rights were violated by a policy or custom of Centurion. *Monell v. Dep't. of Social Services*, 436 U.S. 658, 694−95 (1978). "The critical question under *Monell* is whether a policy or custom of a municipal entity caused a constitutional deprivation." *Gonzalez v. McHenry Co., Ill.*, 40 F.4th 824, 829 (7th Cir. 2022). For *Monell* liability to attach, Mr. Swann must first show that he was deprived of a federal right, and then that the deprivation was caused by a Centurion custom or policy or failure to implement a needed policy. *Dean,* 18 F.4th at 235. Further, to the extent that the plaintiff is challenging a facially lawful policy (express or implied), the plaintiff must provide evidence of a "pattern of similar constitutional violations resulting from the policy*." Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (cleaned up). If challenging an unconstitutional municipal practice or custom, the plaintiff must show "evidence that the identified practice or custom caused multiple injuries." *Id.* (cleaned up).

Mr. Swann fails on the first prong. Mr. Swann alleged in his complaint that Centurion maintains a) a policy of not issuing lower bunk passes to overweight individuals with chronic back pain; b) a practice of denying off-site medical requests in favor of less expensive and ineffective treatments; c) a practice of understaffing doctors and nurses, thereby causing delays; and d) a practice of allowing nurses and doctors to falsely report that patients have refused treatment when they have not. Dkt. 54 at 2, 4. But as previously established, he has not shown that he was deprived of a federal right with respect to his medical treatment by any individual defendant or that he was subjected to deliberate indifference in his medical care. See *Pyles*, 771 F.3d at 412 (citing *City of*

*Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam)) (stating "Wexford cannot be held liable for damages because there is no underlying constitutional violation."). And further, Mr. Swann has not addressed any argument related to his *Monell* claims against Centurion in his response, which failure to respond can be construed as a waiver. Although courts liberally construe a pro se plaintiff's filings, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), a complete failure to respond to an argument results in a waiver. See *Martin v. Jones*, 752 F. App'x 368, 369 (7th Cir. 2019), reh'g denied (Mar. 5, 2019) Accordingly, summary judgment must be **granted** for Centurion.

### B. State Law Medical Malpractice Claims

With Mr. Swann's constitutional claims staged for dismissal, the Court has discretion whether to exercise supplemental jurisdiction over his remaining state-law claims. 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."); *see also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise supplemental jurisdiction after dismissing every claim over which it had original jurisdiction is entirely discretionary."). "Indeed, when the federal claims are dismissed before trial, *there is a presumption* that the court will relinquish jurisdiction over any remaining state law claims." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016) (emphasis added).

When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (internal quotation marks and quoted authority omitted).

In the Seventh Circuit, "the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly*, 193 F.3d 496, 501 (7th Cir. 1999); *see also Sharp Elecs. v. Metropolitan Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) ("Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits.") (internal quotation marks and quoted authority omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation marks and quoted authority).

No circumstance in this case overcomes the presumption that the Court should relinquish jurisdiction over Mr. Swann's state-law medical malpractice claims. The statute of limitations is not a factor. Both federal and state law toll the relevant limitation period when claims are pending in a civil action (except in limited circumstances not present here). *See* 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266 (7th Cir. 1998). Having resolved all claims within its original jurisdiction, the Court exercises its discretion and relinquishes supplemental jurisdiction over Mr. Swann's state law claims.

## IV.
## Conclusion

The Defendants' motion for summary judgment is **GRANTED**. Dkt. [171].

Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 11/24/2025

_____
JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

TERRANCE SWANN
956680
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
P.O. Box E
NEW CASTLE, IN 47362

All Electronically Registered Counsel